*Kevin Whittington v. State of Maryland*, No. 35, September Term 2020. Opinion by Hotten, J.

**CRIMINAL PROCEDURE – FOURTH AMENDMENT – WARRANT REQUIREMENT –** Detectives applied for and received a court order, pursuant to Md. Code Ann., Criminal Procedure ("Crim. Proc.") § 1-203.1, that authorized the placement of a tracking device on Petitioner's vehicle for thirty days. Thereafter, members of law enforcement executed a search of Petitioner's vehicle and residence, pursuant to a search warrant supported in part by location information provided through the tracking device. Petitioner challenged whether the issuance of a "court order" pursuant to Crim. Proc. § 1-203.1 violated the United States Constitution because it did not use the precise label of "warrant." The Court of Appeals held that Crim. Proc. § 1-203.1 substantially complied with the warrant requirement of the Fourth Amendment to the United States Constitution, and the label "court order" instead of "warrant" did not render the statute unconstitutional.

**CRIMINAL PROCEDURE – FOURTH AMENDMENT – PROBABLE CAUSE –** A warrant withstands appellate scrutiny if the issuing judge had a "substantial basis" in concluding that a search would uncover evidence of wrongdoing. *Stevenson v. State*, 455 Md. 709, 723-24, 168 A.3d 967, 975-76 (2017). A substantial basis may arise from reasonable inferences of criminal activity and not necessarily from direct inculpatory observations. The Court of Appeals held that the issuing judge had a substantial basis to conclude that a search of Petitioner's vehicle and residence would yield evidence of wrongdoing through GPS tracking of Petitioner's vehicle traveling to and from suspected stash houses, reasonable inferences from detectives' professional experience, and first-hand observations of Petitioner's suspected involvement in narcotics transactions, evasive driving, and confederation with a known narcotics distributor.

**CRIMINAL PROCEDURE – FOURTH AMENDMENT – GOOD FAITH EXCEPTION –** The good faith exception to the exclusionary rule of the Fourth Amendment to the United States Constitution permits the admission of evidence obtained pursuant to a warrant later shown to lack probable cause, so long as the officers reasonably relied on the warrant issued by a detached and neutral magistrate. *United States v. Leon*, 468 U.S. 897, 922-24, 104 S. Ct. 3405, 3420-21 (1984). An officer may reasonably rely on a warrant that provides some indicia of probable cause or generates disagreement among thoughtful, competent judges as to a finding of probable cause. *Stevenson*, 455 Md. at 729, 168 A.3d at 978-79. The Court of Appeals held, *arguendo*, that if the underlying warrant lacked a substantial basis to support a finding of probable cause, the detectives reasonably relied on the warrant because it contained observations of Petitioner engaged in suspected narcotics activity.

Circuit Court for Baltimore County
Case No. 03-K-17-000239
Argued: March 8, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 35

September Term, 2020

_____

KEVIN WHITTINGTON

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
McDonald,
Hotten,
Getty,
Booth,
Biran,
Raker, Irma S. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Hotten, J.

_____

Filed: June 2, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Petitioner, Kevin Whittington, ("Whittington") challenged the constitutionality of evidence obtained against him, following an investigation by the Harford County Narcotics Task Force[1] ("Task Force") into suspected drug distribution activity occurring between Harford and Baltimore counties. Task Force detectives had applied for and received an "Application for Court Order" pursuant to Md. Code, Criminal Procedure ("Crim. Proc.") § 1-203.1, to install a Global Positioning Satellite ("GPS") tracking device on Whittington's vehicle. With the aid of the GPS tracking device, Task Force detectives observed Whittington engage in activities consistent with narcotics distribution in Harford and Baltimore counties. The Task Force detectives applied for and received a search warrant for certain locations, including Whittington's vehicle and suspected residence at 4 Cloverwood Ct. ("Cloverwood Court") in Essex, Baltimore County, where the detectives had probable cause to believe that Whittington either stored or manufactured narcotics.

---

[1] The Harford County Narcotics Task Force is a highly trained, self-governing, multi-jurisdictional entity with a mission to investigate offenses in the areas of mid to upper level drug trafficking, while supporting and facilitating cooperation and coordination among federal, state, and local law enforcement. The Harford County [Narcotics] Task Force is comprised of the Harford County Sheriff's Office, Maryland State Police, Aberdeen Police Department, Bel Air Police Department, Havre de Grace Police Department, Drug Enforcement Administration, and the Harford County State[']s Attorney's Office[.]

Office of Media and Public Relations, *News Release*, Harford County Sheriff's Office (Jan. 23, 2018), https://harfordsheriff.org/news/releases/harford-county-narcotics-task-force-makes-significant-heroin-arrest-and-cash-seizure-from-a-baltimore-city-dealer-linked-to-several-overdoses-in-harford-and-surrounding-counties/, archived at https://perma.cc/VM4Z-Y5WS.

Members of law enforcement executed the search warrant and found the presence of cocaine in Whittington's vehicle and at Cloverwood Court. Whittington was arrested and indicted in the Circuit Court for Baltimore County on two counts of Possession of a Controlled Dangerous Substance ("CDS") with Intent to Distribute, and two counts of Possession of CDS. In the circuit court, Whittington moved to suppress the evidence, arguing that the GPS tracking of his vehicle violated the Fourth Amendment to the United States Constitution[2] because it was issued pursuant to a "court order," and that the affidavit in support of a search warrant failed to provide probable cause to search his vehicle and the residence at Cloverwood Court, because the detectives did not provide direct evidence of CDS activity occurring within either his vehicle or that address. The circuit court rejected Whittington's argument that the court order violated the Fourth Amendment, agreed that the search warrant lacked probable cause, but determined that the good faith exception to the exclusionary rule[3] of the Fourth Amendment applied because the arresting

---

[2] The Fourth Amendment to the United States Constitution provides, in relevant part, that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

[3] The United States Supreme Court created the "exclusionary rule" to prevent the admission of evidence obtained in violation of the Fourth Amendment. *Franks v. Delaware*, 438 U.S. 154, 165, 98 S. Ct. 2674, 2681 (1978) (discussing the exclusionary rule and its creation in *Weeks v. United States*, 232 U.S. 383, 34 S. Ct. 341 (1914)). The exclusionary rule is "designed to safeguard Fourth Amendment rights generally through its deterrent effect [on future unlawful police conduct], rather than a personal constitutional right of the party aggrieved." *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 620 (1974) (footnote omitted). The good faith exception to the exclusionary rule permits the admission of evidence later determined to be obtained in violation of the Fourth Amendment because the United States Supreme Court recognized that law enforcement

(continued . . .)

2

officers reasonably relied upon the search warrant. The circuit court denied Whittington's motion to suppress.

After the suppression hearing on September 18, 2018, Whittington entered a conditional guilty plea pursuant to Maryland Rule 4-242(d).[4] Following the acceptance of the conditional plea, the circuit court found Whittington guilty and imposed a sentence of ten years' imprisonment, suspending all but time already served and five years of supervised probation. Whittington appealed his conviction to the Court of Special Appeals, which held that the GPS court order issued pursuant to Crim. Proc. § 1-203.1 satisfied the warrant requirement of the Fourth Amendment and agreed with the circuit court that the detectives objectively relied on the search warrant in good faith. The Court of Special Appeals affirmed the denial of the motion to suppress and the conviction by the circuit court.

---

(. . . continued)

cannot be deterred from engaging in future unlawful police conduct if law enforcement obtained and executed a warrant in objective good faith. *United States v. Leon*, 468 U.S. 897, 920, 104 S. Ct. 3405, 3419 (1984). This Court has "declined to decide whether *Maryland law* generally recognizes an [equivalent] exclusionary rule[.]" *Parker v. State*, 402 Md. 372, 396, 936 A.2d 862, 876 (2007) (emphasis added); *see infra* note 17.

[4] Maryland Rule 4-242(d)(2) provides in pertinent part:

With the consent of the court and the State, a defendant may enter a conditional plea of guilty. The plea shall be in writing and, as part of it, the defendant may reserve the right to appeal one or more issues specified in the plea that (A) were raised by and determined adversely to the defendant, and, (B) if determined in the defendant's favor would have been dispositive of the case. The right to appeal under this subsection is limited to those pretrial issues litigated in the circuit court and set forth in writing in the plea.

Whittington timely appealed to this Court. We granted *certiorari* on November 10, 2020 to address the following questions:[5]

1. Did [the Court of Special Appeals], in a case of first impression, err in holding that the placement and use of a GPS tracking device was legal because a GPS Order issued under [Crim. Proc.] § 1-203.1 satisfied the Fourth Amendment warrant requirement?

2. As a matter of first impression, did the issuing judge have a substantial basis for finding probable cause from exclusively circumstantial evidence of Whittington's drug distribution activities that provided a sufficient nexus to support a warrant to search his home, car, and person?[6]

3. Did [the Court of Special Appeals] err in finding that the good faith exception to the Fourth Amendment exclusionary rule applied in this case?

We answer the first and third questions in the negative, the second in the affirmative and shall affirm the judgment of the Court of Special Appeals.

## FACTS AND PROCEDURAL BACKGROUND

### The Underlying Incident

The following factual background comes from an affidavit sworn to by Detective Brandon Underhill of the Harford County Narcotics Task Force in an "Application for Court Order" from the District Court of Maryland sitting in Harford County. On October 8, 2016, a District Court judge granted the "Application for Court Order" and authorized a GPS tracker to monitor the whereabouts of a 2002 Dodge Stratus, registered to Whittington.

---

[5] We have reordered the questions presented for analytical consistency and clarity.

[6] The State posed this question on conditional cross-petition.

4

The Task Force began investigating Whittington based on his association with a suspected narcotics distributor with the street name of "Heavy." In spring 2016, through the assistance of a confidential informant, detectives identified "Heavy" as David Hall. Task Force detectives, authorized by a separate court order, initiated interception of Hall's cellular phone communications and discovered that Whittington was the most frequent contact. Task Force detectives believed Hall and Whittington used coded communications to refer to locations for "processing powder cocaine into crack cocaine for distribution."

On July 5, 2016, Task Force detectives observed Hall with Whittington in a 2002 Dodge Stratus registered to Whittington.[7] Task Force detectives, when following Hall and Whittington, noticed evasive, circuitous driving, which the detectives described as "a technique often employed by drug dealers." On October 4, 2016, Task Force detectives observed Hall and a person later identified as Whittington meet at the residence of 101 Orsburn Drive in Joppa, Harford County. At the time, Task Force detectives intercepted a communication between Hall and Whittington in which "both [were] very concerned that a marked patrol car had been in the area while they were leaving." Task Force detectives observed Hall and Whittington traveling in the Dodge Stratus again on October 7, 2016. Task Force detectives intercepted a coded phone call from which "based on the context of the conversation, it was clear that" a drug transaction was being arranged. Based on his professional experience, Detective Underhill characterized the observed activity as

---

[7] Maryland Vehicle Administration records included a picture of Whittington along with a listed address of 3106 Laurel View Drive, in Abingdon, Harford County. Based on their observations, Task Force detectives concluded that Whittington's real address was 4 Cloverwood Court in Essex, Baltimore County. *See infra* note 10.

5

consistent with narcotics possession and distribution.  Detective Underhill also noted in the application for the court order that Whittington had been found in possession of over three ounces of cocaine when arrested in 2015 by the Harford County Sheriff's Office.

The application for the court order asserted that there was "probable cause that the vehicle, 2002 Dodge Stratus . . . currently registered to [Whittington] with a known address of [Cloverwood Court in Essex, Baltimore County] is being used to commit violations of the laws relating to the illegal Manufacturing, Distribution, Possession with intent to Distribute and Possession of controlled dangerous substances[.]"  (Emphasis omitted).

On October 8, 2016, the District Court of Maryland sitting in Harford County granted the court order authorizing the installation of a GPS mobile tracking device on Whittington's vehicle for a period of thirty days.[8]  With aid of the GPS tracker, Task Force Detectives Underhill and Sam Vivino observed Whittington engage in additional patterns of movement consonant with CDS activity.  The detectives detailed their observations in an application for a search warrant to the District Court of Maryland sitting in Harford County on October 24, 2016.

The sixteen-page application for the search warrant specified four locations and two vehicles which Detectives Underhill and Vivino had probable cause to believe contained evidence relating to "the illegal Manufacturing, Distribution, Possession and Possession

---

[8] The parties do not dispute that the court order was issued pursuant to Crim. Proc. § 1-203.1.  We note, while not required by statute, but with an eye towards preventing future constitutional challenges pursuant to a similar court order, that nowhere on the face of the application for court order did the detectives state that the placement of a GPS tracking device on Whittington's vehicle was authorized by Crim. Proc. § 1-203.1.

6

with Intent to Distribute [CDS.]" Two of the four locations included an apartment at 6032 Amberwood Road in Baltimore City, which detectives believed belonged to David Hall, and an apartment at Cloverwood Court in Essex, Baltimore County, which detectives believed belonged to Whittington. The two other addresses, 2514 Hanson Road in Edgewood, Harford County and 101 Orsburn Drive in Joppa, Harford County, were residences believed to belong to two other associates of Hall and Whittington involved in CDS activity. The detectives suspected these other addresses, along with Amberwood Road and Cloverwood Court, could function as "stash houses" for storing and manufacturing CDS. The two vehicles included the 2002 Dodge Stratus "currently registered to [Whittington] with a known address of [Cloverwood Court]" and a 2001 Dodge Durango "currently registered to David Hall with a known address of [Amberwood Road.]"

The affidavit's basis for searching these locations began with a summary of the investigation preceding the installation of the GPS device on Whittington's vehicle. The detectives supplemented the summary with additional details of suspected CDS activity that occurred before the "Application for Court Order" was granted. On August 10, 2016, Detectives Underhill and Vass[9] witnessed Hall meet with another man, later identified as John Joseph Bruno, Jr., in the parking lot of a community pool on Willoughby Beach Road in Harford County. Hall and Bruno only met for two minutes before Hall pulled away. Bruno eventually left, and was followed by Detective Underhill, who observed Bruno

---

[9] Detective Vass's first name does not appear in the record.

talking on his cellular phone while driving and veering across the solid, double yellow line. Another detective from the Harford County Sheriff's Office Crime Suppression Unit stopped Bruno on MD Route 152, along the western border of Harford County. A Maryland State Police trooper arrived and conducted a search of the vehicle with a drug sniffing dog, which uncovered a previously opened bag of marijuana and an unopened bag of what appeared to be recently packaged cocaine.

Two months later, the detectives observed Hall and Bruno meet again at 101 Orsburn Drive. The detectives noted "that both Hall and Whittington travel to this location frequently," which they believed was "being used . . . to further the drug organization of Hall and Whittington." The affidavit additionally documented Hall's criminal history, which included seventeen different charges relating to CDS activity.

The detectives' particularized description of Whittington's behavior was more exhaustive. On July 5, 2016 and October 7, 2016, detectives recounted the same observations made in the "Application for Court Order[,]" including that Hall and Whittington engaged in circuitous, "paranoid" driving, and made short, frequent stops at locations throughout the region. On October 11, 2016, detectives began GPS surveillance of Whittington's vehicle. Whittington's vehicle traveled to 101 Orsburn Drive in Harford County and was stationary for nine minutes before traveling to a small shopping center at 11450 Pulaski Highway in Baltimore County where it remained for fifteen minutes. Whittington's vehicle returned to 101 Orsburn Drive where it was stationary for approximately 90 minutes before returning to Cloverwood Court at the end of the day. The detectives stated "[t]his is consistent with drug activity."

8

On October 12, 2016, detectives tracked Whittington's vehicle engaged in similar activity. It traveled from Cloverwood Court to 101 Orsburn Drive where it remained for two hours before departing. The next day, the vehicle left Cloverwood Court and traveled to various locations in Harford County before returning to 101 Orsburn Drive for a short stint. The vehicle traveled to 1105 Old Mountain Road in Joppa, Harford County, remaining at the location for three minutes before returning to 101 Orsburn Drive. After twenty minutes, Whittington's vehicle departed again and eventually returned to Cloverwood Court.

On October 14, 2016, Whittington's vehicle traveled again to 101 Orsburn Drive, where it remained for two hours. Throughout the day, the vehicle traveled to and made brief stops at various locations and parking lots in the region. The affidavit specifically noted a fourteen-minute stop at the 5300 block of King Arthur Circle in Baltimore County. The vehicle returned to Cloverwood Court at the end of the day.

The Task Force conducted in-person surveillance of Whittington on October 17, 2016. Task Force units observed Whittington enter a Wendy's fast-food restaurant in Abingdon, Harford County for less than three minutes. Whittington left the location with another unidentified male and neither man carried any items from the restaurant. The two men traveled together to the same small shopping center at 11450 Pulaski Highway that Whittington had visited for nine minutes on October 11 and remained there for ten minutes. Whittington dropped the unidentified male at the 5300 block of King Arthur Circle.

Whittington returned to 101 Orsburn Drive, where Hall was also present in his Dodge Durango vehicle. Whittington then took an unusual route to return to Cloverwood Court.[10]

The District Court of Maryland sitting in Harford County granted the search warrant on October 24, 2016, the same day of application.[11] Members of law enforcement stopped Whittington while he was driving in Baltimore County and found $1,406 and two cellular phones on Whittington's person. A search of the Dodge Stratus revealed eight grams of cocaine. A search of Cloverwood Court revealed ten Alprazolam pills,[12] $1,222 in cash, and 145.9 grams of cocaine with a street value of $14,590.

The State charged Whittington by indictment in the Circuit Court for Baltimore County with Possession with Intent to Distribute Cocaine, Possession of Cocaine, and

---

[10] The detectives concluded that Cloverwood Court was Whittington's home:

A check through databases including Maryland Department of Assessments and Taxation showed that the real property of 4 Cloverwood Court [] is owned by Bernard and Denotta Teagle, with an address of 3106 Laurel View Drive in Abingdon. Detectives immediately recognized 3106 Laurel View Drive as Whittington's Motor Vehicle Administration address. He has also been seen at that location on multiple occasions. Based on the totality of the circumstances, your affiants believe that [] Whittington's actual residence is at 4 Cloverwood Court[].

[11] A District Court judge has territorial jurisdiction to issue a search warrant for execution in any Maryland county. *Birchead v. State*, 317 Md. 691, 699, 566 A.2d 488, 492 (1989).

[12] Alprazolam, often sold under the brand name, Xanax, is most commonly used to treat anxiety disorders. Mayo Clinic, *Alprazolam (Oral Route)* (Apr. 1, 2021), https://www.mayoclinic.org/drugs-supplements/alprazolam-oral-route/description/drg-20061040, archived at https://perma.cc/Q9QT-GSA2. A person may not possess Alprazolam, a controlled dangerous substance, "unless obtained directly or by prescription or order from an authorized provider acting in the course of professional practice[.]" Md. Code Ann., Criminal Law § 5-601(a)(1).

10

Possession of Alprazolam. Whittington tendered a conditional guilty plea to the charge of Possession with Intent to Distribute Cocaine. The circuit court found Whittington guilty and imposed a sentence of ten years' imprisonment, suspended all but time already served and five years of supervised probation. The State entered the remaining counts *nolle prosequi*.

## Legal Proceedings

### A. Suppression Hearing

On September 18, 2018, in the Circuit Court for Baltimore County, Whittington filed a motion to suppress all evidence recovered from the search of Cloverwood Court and the 2002 Dodge Stratus. Whittington presented three arguments in favor of suppression. First, the search warrant lacked probable cause because Task Force detectives could not provide a "substantial basis" for searching Cloverwood Court located miles away from the alleged drug activities. The Task Force detectives offered no direct evidence that Whittington resided at the Cloverwood Court address, let alone engaged in drug activity there. Second, GPS tracking of Whittington's vehicle violated the Fourth Amendment, because it was conducted pursuant to a court order, and not a warrant, as the Fourth Amendment prescribes. The search authorized by a court order issued pursuant to Crim. Proc. § 1.203.1 therefore violated the Fourth Amendment. Third, the good faith exception to the exclusionary rule of the Fourth Amendment did not apply in this case because the exception has been limited to warrants, not court orders. Even if it applied to court orders, Whittington argued that it cannot apply in this case because the underlying search lacked probable cause.

11

The circuit court denied the motion to suppress the evidence obtained pursuant to the warrant. The circuit court agreed with Whittington's substantial basis argument in that the warrant did not provide facts giving rise to an inference of CDS activity at Cloverwood Court.[13] According to the circuit court, the detectives did not document alleged drug sales at Cloverwood Court. Rather, the affidavit demonstrated potential drug activity at 101 Orsburn Drive. The circuit court stated that the suspicion of drug activity at Cloverwood Court "seems inconsistent" with the suspected CDS activity documented in the affidavit. The circuit court further explained:

> There's no description of any drug activity, other than suspicions, but there's no sells. There's no covert activity. *Yes, it possibly could be, but it also could possibly be something else*. . . . [T]he only drug activity I saw in here was the very first thing where there was Mr. Hall meeting with an individual, [] by the officers' statement, they couldn't see what they were doing. They didn't see any transactions going on in -- in the car. And the person drove off. They stop them on a traffic violation and they got one bag of cocaine. There's -- there's no mention of anything that . . . Mr. Hall was the distributor of that cocaine, but even though there's no evidence that he did. But there's . . . no allegations that Mr. Whittington was ever around any drugs. They -- they didn't see any sales. They didn't see any hand to hands. They didn't see any, uh, no[t] a lot of foot traffic coming out of the house. I -- I -- I'm troubled [] by this. I mean, there's a lot of facts given, but a lot of the facts I don't find to be terribly relevant, other than that he -- he goes to the house and he sleeps there. What -- what activity is there about the house?

(Emphasis added).

The circuit court nonetheless found that the detectives relied on the warrant in good faith. "[T]here's nothing so obvious in [the warrant] that an officer would not deem it to be reasonable based on the issuance of it by a neutral magistrate, or in this particular case

---

[13] The circuit court neither discussed, nor reached, the question of whether there was a deficient substantial basis to search Whittington's vehicle.

12

District Court judge." The circuit court concluded that the court order was lawfully issued pursuant to Crim. Proc. § 1-203.1, which expressly authorizes court orders by statute. The circuit court left the question of the statute's underlying constitutionality for appellate review.

## B. Opinion of the Court of Special Appeals

The Court of Special Appeals held that the court order issued pursuant to Crim. Proc. § 1-203.1, authorizing the placement of a GPS tracking device on Whittington's vehicle, satisfied the warrant requirement of the Fourth Amendment and that the circuit court correctly denied the motion to suppress. The Court rejected Whittington's facial constitutional challenge of Crim. Proc. § 1-203.1, because Whittington failed to "demonstrate that there is 'no set of circumstances' under which the statute would be valid." *Kevin Whittington v. State*, 246 Md. App. 451, 471, 230 A.3d 148, 161 (2020) (citing *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987)) (footnote omitted).

The Court also dismissed Whittington's contention that a "court order" can never satisfy the warrant requirement of the Fourth Amendment. "[I]n this case, as in most, the label is not dispositive." *Id.* at 472, 230 A.3d at 160. According to the Court, the constitutionality of a court order hinges on its substance, not form. *Id.*, 230 A.3d at 161 (citing *State v. Copes*, 454 Md. 581, 625, 165 A.3d 418, 444 (2017)). The United States Supreme Court, in *United States v. Jones*, 565 U.S. 400, 132 S. Ct. 945 (2012), held that placement of a GPS tracker constituted a search, but according to the Court, *Jones* never

specified that a warrant was required to utilize a GPS tracker, let alone a document formally labeled as a warrant. *Whittington*, 246 Md. App. at 473-74, 230 A.3d at 162.

The Court next determined that Crim. Proc. § 1-203.1 complied with the Fourth Amendment. According to the Court, a plain text analysis demonstrates "that the statute embodies all of the warrant requirements inhering in the Fourth Amendment." *Id.* at 481, 230 A.3d at 166. The statute enumerates the basis for probable cause, including facts within the personal knowledge of the affiant. The written application for a court order must be signed and sworn to by the applicant and accompanied by an affidavit. It also requires applicants to "describe with reasonable particularity" the type of device used, the user of the device, the identifying number of the device, and grounds for obtaining the information. *Id.* at 482, 230 A.3d at 166. Finally, the statute provides time limitations and notice requirements.

The Court of Special Appeals also surveyed sister jurisdictions that have enacted similar statutes regulating the use of GPS technology by law enforcement. While these states have not confronted the precise question of whether the term "court order" categorically precludes compliance with the Fourth Amendment, in the Court's estimation, none of the appellate court decisions from these states have struck down a statute because of its particular nomenclature. *Id.* at 485, 230 A.3d at 169. The Court concluded that the court order issued pursuant to Crim. Proc. § 1-203.1 satisfied the requirements of the Fourth Amendment.

The Court of Special Appeals also upheld the circuit court's decision to deny the motion to suppress. The Court determined that the good faith exception to the warrant

14

requirement applied and assumed without deciding that the District Court did not have a substantial basis to find probable cause. The Court explained that evidence obtained in violation of the Fourth Amendment, including an insufficient showing of probable cause, is ordinarily inadmissible. *Id.* at 491, 230 A.3d at 172. The good faith exception allows such evidence to be admitted "if the executing officers acted in objective good faith with reasonable reliance on the warrant." *Id.*, 230 A.3d at 172 (citation omitted).

The Court of Special Appeals noted that this Court has applied the good faith exception even in cases where "there was no substantial basis for probable cause." *Id.* at 493, 230 A.3d at 173 (citing *Patterson v. State*, 401 Md. 76, 82, 930 A.2d 348, 351-52 (2007)). The Court examined *Agurs v. State*, 415 Md. 62, 998 A.2d 868 (2010), because of the parties' "extensive[] brief[ing,]" on the case, but ultimately distinguished *Agurs* from the instant case on the facts. *Whittington*, 246 Md. at 498, 230 A.3d at 177. Unlike *Agurs*, in which a "single assertion" of suspected criminal activity raised an issue of whether law enforcement could have objectively and in good faith relied on the warrant, the detectives in this case detailed extensive observations of Whittington's behavior that appeared consistent with CDS activity. *Id.* at 495, 230 A.3d at 175 (quoting *Agurs*, 415 Md. at 89, 998 A.2d at 884). The Court of Special Appeals also pointed to the detectives' professional experience in investigating and interdicting narcotics distribution as further substantiation of probable cause, and by extension, reasonable reliance on the warrant. *Id.* at 497, 998 A.2d at 176. Most importantly, the level of detail in the sixteen-page search warrant affidavit for Whittington was qualitatively distinct from the warrant in *Agurs*, which was

15

rife with "wholly conclusory statements[.]" *Id.* at 500, 230 A.3d at 177 (quoting *Agurs*, 415 Md. at 79, 998 A.2d at 878).

The Court of Special Appeals concluded that the detectives' reliance on the warrant was reasonable, "[t]hus the circuit court [] was correct in applying the good faith exception and denying [] Whittington's motion to suppress." *Id.* at 500, 230 A.3d at 178.

## DISCUSSION

### Standard of Review

When reviewing the constitutionality of a statute, "[t]he basic rule is that there is a presumption" that the statute is valid. *Galloway v. State*, 365 Md. 599, 610, 781 A.2d 851, 857 (2001) (citations omitted). "We are reluctant to find a statute unconstitutional if, 'by any construction, it can be sustained.'" *Id.* at 611, 781 A.2d at 858 (quoting *Beauchamp v. Somerset Cty. Sanitary Commission*, 256 Md. 541, 547, 261 A.2d 461, 463 (1970)). If, however, a statute violates a "mandatory provision" of the United States Constitution, "we are required to declare such an act unconstitutional and void. [. . .]" *Id.*, 781 A.2d at 858 (citation omitted). Whittington, as the party attacking Crim. Proc. § 1-203.1, has the burden of establishing its unconstitutionality. *Id.*, 781 A.2d at 858.

"In reviewing the rulings of the suppression courts, we rely solely upon the record developed at the suppression hearings." *Kelley v. State*, 436 Md. 406, 420, 82 A.3d 205, 213 (2013). "We view the evidence and inferences that may be drawn therefrom in the light most favorable to the party who prevails on the motion, here, the State." *Id.*, 82 A.3d at 213. "We defer to the motions court's factual findings and uphold them unless they are

16

shown to be clearly erroneous." *Lee v. State*, 418 Md. 136, 148, 12 A.3d 1238, 1246 (2011).

"The ultimate question as to whether there was a constitutional violation [of the Fourth Amendment] is a legal question on which we accord no special deference to the trial court." *Copes*, 454 Md. at 603, 165 A.3d at 431. The application of whether the good faith exception to the exclusionary rule of the Fourth Amendment applies also is a legal issue that we review without deference. *Id.*, 165 A.3d at 431.

## Contentions of the Parties

Whittington contends that the Fourth Amendment strictly requires that only a formal document labeled as a "warrant" satisfies the warrant requirement. The language of the Fourth Amendment specifically uses the term "Warrants[,]" which according to Whittington, necessarily precludes the use of functional equivalents, such as court orders. For Whittington, if the Fourth Amendment permitted functional equivalents, "there would be nothing to prevent law enforcement from using a court order meeting the requirements of [Crim. Proc.] § 1-203.1 or some other statute, instead of a warrant, to search an individual's home." Whittington argues that equating Crim. Proc. § 1-203.1 substantively with a warrant demonstrates the redundancy of the statute—law enforcement could and should have applied for a warrant instead.[14]

---

[14] During oral argument Whittington's counsel also assumed that this analysis would render unconstitutional all other court orders supported by probable cause and authorized by statute, such as the Maryland Wiretap Act, codified at Md. Code Ann., Courts and Judicial Proceedings ("Cts. & Jud. Proc.") §§ 10-401-414. Oral Argument at 4:52, *Kevin Whittington v. State of Maryland*, 471 Md. 264, 241 A.3d 860 (2020) (No. 35),

(continued . . .)

Whittington also argues that the Court of Special Appeals' interpretation of Crim. Proc. § 1-203.1 goes against the majority of states that require a "warrant" and not a "court order" to authorize the placement of a GPS tracking device on a vehicle. According to Whittington, the fact that no other states have addressed the difference in nomenclature between order and warrant demonstrates "no authoritative support for the position taken by the [Court of Special Appeals] in this case."

Whittington next contends that the Court of Special Appeals erred in applying the good faith exception because "the warrant lacked any indicia of probable cause due to there being a clear lack of nexus between the nature of the items sought and the place where they were to be seized." In short, Whittington argues that the detectives could not have reasonably relied on the warrant when the warrant lacked a substantial basis for probable cause.

The United States Supreme Court, in *Leon*, suggested four instances where the good faith exception does not apply.[15] Of the four instances, Whittington argues that the

_____

(. . . continued)
https://www.courts.state.md.us/sites/default/files/import/coappeals/media/2020/coa20210 308caseno35.mp4 [hereinafter "Oral Argument"], archived at https://perma.cc/9LQ7-NRFJ.

[15] The *Leon* Court suggested the following four instances:

(1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless regard for the truth;
(2) the magistrate wholly abandoned his detached and neutral judicial role;
(3) the warrant was based on an affidavit that was so lacking in probable cause as to render official belief in its existence entirely unreasonable; and

(continued . . .)

18

following applies to this case: "a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" 468 U.S. at 923, 104 S. Ct. at 3421 (citation omitted).

Whittington asserts that the plurality opinion in *Agurs*, which concluded that "no reasonably well-trained police officer could have relied in good faith on the warrant authorizing the search of Agurs' home[,]" controls the outcome of the case because Whittington argues that there is even *less* of a basis in the instant case than in *Agurs*. 415 Md. at 87-88, 998 A.2d at 883. At least in *Agurs*, according to Whittington, the police saw Agurs enter and leave his home on several occasions; whereas the detectives, in this case, never saw Whittington enter and leave his registered home address, rather only a location suspected as being Whittington's home. Whittington contends that the detectives could, at most, only conclude that Whittington slept at Cloverwood Court. Even if *Agurs* is not controlling, Whittington argues that because the affidavit lacked facts indicative of criminal activity, the detectives should have known there was deficient probable cause to search Cloverwood Court.

The State counters that there is no merit or legal support for Whittington's claim that a document must be labeled a "warrant" to satisfy the Fourth Amendment. This Court previously explained in *Copes* that when the constitutional criteria authorizing the issuance

---

(. . . continued)

> (4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot [reasonably] presume it to be valid.

*Patterson*, 401 Md. at 104, 930 A.2d at 365 (quoting *Leon*, 468 U.S. at 923, 104 S. Ct. at 3421).

of a warrant "are met, it does not matter whether the order is labeled a warrant. The constitutional requirements are addressed to substance, not form." 454 Md. at 625, 165 A.3d at 444. The United States Supreme Court has interpreted the warrant requirement of the Fourth Amendment to contain only three requirements: probable cause in sworn testimony, describing items or persons to be searched or seized with particularity, and presented to a detached, neutral magistrate. *Dalia v. United States*, 441 U.S. 238, 255, 99 S. Ct. 1682, 1692 (1979). According to the State, the United States Supreme Court has never read a warrant label requirement into the Fourth Amendment, and in *Dalia*, had no problem affirming a court order's substantive compliance with the warrant requirement of the Fourth Amendment. *See id.* at 256, 99 S. Ct. at 1692 ("[t]he April 5 court order authorizing the interception of oral communications occurring within petitioner's office was a warrant issued in full compliance with these traditional Fourth Amendment requirements.").

According to the State, a court order issued pursuant to Crim. Proc. § 1-203.1 contains the same substantive requirements of a warrant. Whittington does not identify any meaningful distinction between a court order and a warrant.[16] A court order issued pursuant to Crim. Proc. § 1-203.1 complies with the requirements of the Fourth Amendment.

---

[16] We note that Whittington's counsel admitted during oral argument before this Court that other than nomenclature, there is no substantive difference between a court order and a warrant. Judge Irma S. Raker asked, "you are agreeing [] that both [a court order and warrant] require the same information?" Oral Argument at 6:58. To which Whittington's counsel replied, "[T]he order requires the same information that a warrant would require— I do agree with that." Oral Argument at 7:08.

The State also argues that the District Court had a substantial basis for finding probable cause from exclusively circumstantial evidence of Whittington's CDS activities. Even if the District Court lacked a substantial basis for issuing a warrant, the State contends that the Court of Special Appeals properly affirmed the circuit court's finding that the officers acted in good faith reliance on the validity of the search warrant for Whittington's home, car, and person.

**Analysis of Crim. Proc. § 1-203.1**

A. **The court order issued pursuant to Crim. Proc. § 1-203.1 satisfies the warrant requirement of the Fourth Amendment.**

The Fourth Amendment and Article 26 of the Maryland Constitution, Declaration of Rights[17] protect against unlawful search and seizures. The United States Supreme Court held in *Jones* that placing a GPS tracking device on a person's vehicle constitutes a search. Since the detectives placed a GPS tracking device on Whittington's vehicle, the first issue

---

[17] Article 26 of the Maryland Declaration of Rights provides:

> That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

While the parties did not present their arguments under Article 26, this Court has held the protections of Article 26 to be co-extensive with those afforded by the Fourth Amendment. *King v. State*, 434 Md. 472, 483, 76 A.3d 1035, 1041 (2013). This Court has not recognized a general exclusionary rule for illegally seized evidence under Article 26. *Id.* at 484, 76 A.3d at 1042. Whittington must demonstrate that the detectives' conduct violated the federal Constitution to suppress the evidence obtained therefrom. *Brown v. State*, 397 Md. 89, 98 916 A.2d 245, 251 (2007).

21

before us is whether that search of Whittington's vehicle was unlawful. A lawful search requires either a valid warrant or application of one of the established warrant exceptions. No warrant exception applies in this case, and Whittington argues that the court order issued pursuant to Crim. Proc. § 1-203.1 cannot constitute a valid warrant because of its label as a court order.

We are not persuaded by Whittington's argument that a label determines compliance with the Fourth Amendment. At the outset, we acknowledge a literary, but no less appliable, insight of William Shakespeare, alluded to by the State during the suppression hearing, and referenced by Judge Charles E. Moylan, Jr. of the Court of Special Appeals on more than one occasion:[18]

> What's in a name?  That which we call a rose
> By any other name would smell as sweet;
> So Romeo would, were he not Romeo call'd,
> Retain that dear perfection which he owes
> Without that title.[19]

The Fourth Amendment case law from the United States Supreme Court and our Court, along with the plain text and legislative history of Crim. Proc. § 1-203.1, demonstrates that it is the substance, not the nomenclature, that determines whether a court order issued pursuant to Crim. Proc. § 1-203.1 may constitute a valid warrant.

---

[18] *Morten v. State*, 242 Md. App. 537, 566, 215 A.3d 846, 863 (2019); *McKinney v. State*, 239 Md. App. 297, 311, 196 A.3d 520, 528 (2018).

[19] William Shakespeare, *Romeo and Juliet*, Act 2, Scene 2.

***Case law demonstrates no formal "warrant" label requirement.***

The United States Supreme Court has determined that a valid warrant contains three criteria. First, a warrant must be issued by a neutral, disinterested magistrate. *Lo-ji Sales, Inc. v. New York*, 442 U.S. 319, 326, 99 S. Ct. 2319, 2324 (1979). Second, the affiant seeking the warrant must demonstrate to the magistrate probable cause to believe that "the evidence sought will aid in a particular apprehension or conviction" for a particular offense. *Warden v. Hayden*, 387 U.S. 294, 307, 87 S. Ct. 1642, 1650 (1967). Finally, "warrants must particularly describe the 'things to be seized,'" as well as the place to be searched. *Dalia*, 441 U.S. at 255, 99 S. Ct. at 1692 (citations omitted).

To date, the United States Supreme Court has not determined whether the label of "warrant" impacts the validity of a warrant. In *Carpenter v. United States*, 585 U.S. ___, 138 S. Ct. 2206 (2018), the Court focused its attention on whether a court order issued pursuant to 18 U.S.C. § 2703(d) substantively required a quantum of suspicion equivalent to the probable cause needed for a warrant. *Id.* at ___, 138 S. Ct. at 2221. The Court held that a court order issued pursuant to 18 U.S.C. § 2703(d) failed to comply with the Fourth Amendment because it only required "reasonable grounds for believing records were relevant and material to an ongoing investigation . . . fall[ing] well short of *the probable cause* required for a warrant." *Id.*, 138 S. Ct. at 2211 (emphasis added). In its analysis of the warrant requirement, the United States Supreme Court notably omitted any mention of whether the term "court order" factored into its bottom-line conclusion. *Id.*, 138 S. Ct. at 2211.

Similarly, this Court has never interpreted the warrant requirement of the Fourth Amendment to require a particular label. The majority opinion in *Copes* examined whether a court order issued pursuant to Maryland's Pen Register Statute, Md. Code Ann., Cts. & Jud. Proc. §§ 10-4B-01-05, may substantively comply with the three criteria of a valid warrant: neutral, disinterested magistrate, probable cause, and particularity. 454 Md. at 618-19, 165 A.3d at 440. The majority noted that the court order was issued by a circuit court judge which satisfied the "neutral magistrate" requirement. *Id.* at 625, 165 A.3d at 444. The majority also found that probable cause could have existed based on the detective's summary of evidence collected in the course of a criminal investigation. *Id.* at 595, 165 A.3d at 426. Finally, in satisfaction of the particularity requirement, the court order also indicated a specific cell phone number to be tracked. *Id.* at 625, 165 A.3d at 444. In summary, the majority stated that "[w]hen these criteria are met, *it does not matter whether the order is labeled a 'warrant.' The constitutional requirements are addressed to substance, not form.*" *Id.*, 165 A.3d at 444 (emphasis added).[20]

---

[20] The Court of Special Appeals noted in its opinion that Maryland, along with Florida, Pennsylvania, and South Carolina are the only states that currently require law enforcement officers to obtain an "order" rather than a "warrant" prior to installation of a GPS device. *Whittington*, 246 Md. App. at 483 n.15, 230 A.3d at 168 n.15. Appellate decisions from these three other states support our conclusion that "[t]he content of a court's order—not the label affixed to it—determines whether a warrant satisfies the Fourth Amendment." *State v. Sylvestre*, 254 So. 3d 986, 989 (Fla. Dist. Ct. App. 2018); *see also Com. v. Burgos*, 64 A.3d 641, 655 (Pa. Super. Ct. 2013) ("Therefore, in keeping the purpose and functionality of the Wiretap Act in mind, it is evident that these wiretap *orders* serve as the functional equivalent of traditional search warrants.") (emphasis added); *State v. Adams*, 409 S.C. 641, 650, 763 S.E.2d 341, 346 (2014) (using the term "warrant" interchangeably with "order" when describing the warrant requirement of the South Carolina GPS tracking statute).

While the dissent in *Copes* ultimately concluded that the court order issued did not satisfy the Fourth Amendment, the dissent still acknowledged that "the use of a cell site simulator requires a valid search warrant, *or an order satisfying the constitutional requirements of a warrant*[.]" *Id.* at 630, 165 A.3d at 447 (Hotten, J., dissenting) (citation omitted) (emphasis added). The case law from the United States Supreme Court and this Court demonstrates no support for Whittington's formalistic contention that the use of another term besides "warrant" categorically prevents compliance with the Fourth Amendment. Crim. Proc. § 1-203.1 is not unconstitutional merely because it does not use the term "warrant."

### Crim. Proc. § 1-203.1 complies with the warrant requirement of the Fourth Amendment.

We now turn to whether a court order issued pursuant to Crim. Proc. § 1-203.1 substantively satisfies the three criteria of a valid warrant: a detached neutral magistrate, probable cause, and particularity. We agree with the Court of Special Appeals that "[t]he plain language of [Crim. Proc.] § 1-203.1 shows that the statute embodies all of the warrant requirements inhering in the Fourth Amendment." *Whittington,* 246 Md. App. at 481, 230 A.3d at 166. The statute complies with the requirement of a neutral, detached magistrate because it requires a court, either "the District Court or a circuit court having jurisdiction over the crime being investigated," to issue the court order. Crim. Proc. § 1-203.1(a)(3) & (b)(1).

The statute satisfies the requirement of probable cause because the plain text requires, before issuing the court order, a finding of probable cause to believe that:

(i) a misdemeanor or felony has been, is being, or will be committed by the owner or user of the electronic device or by the individual about whom location information is being sought; and
(ii) the information sought by the cell site simulator or the location information being sought:
> 1. is evidence of, or will lead to evidence of, the misdemeanor or felony being investigated; or
> 2. will lead to the apprehension of an individual for whom an arrest warrant has been previously issued.

Crim. Proc. § 1-203.1(b)(1).  The plain text also requires an affiant, when articulating the basis for probable cause, to meet the following conditions:

(2) An application for an order under this section shall be:
> (i) in writing;
> (ii) signed and sworn to by the applicant; and
> (iii) accompanied by an affidavit that:
>> 1. sets forth the basis for the probable cause . . . and
>> 2. contains facts within the personal knowledge of the affiant.

Crim. Proc. § 1-203.1(b)(2).

The statute also satisfies the criterion of particularity by specifying what a court order must identify as the object of the search:

(3) An order to obtain location information issued under this section shall:
> (i) name or describe with reasonable particularity:
>> 1. the type of electronic device associated with the location information being sought;
>> 2. the user of the electronic device, if known, or the identifying number of the electronic device about which location information is sought;
>> 3. the owner, if known and if the owner is a person or an entity other than the user, of the electronic device;
>> 4. the grounds for obtaining the location information; and
>> 5. the name of the applicant on whose application the order was issued[.]

Crim. Proc. § 1-203.1(b)(3).  In sum, the plain text of Crim. Proc. § 1-203.1 fulfills the three criteria of a valid warrant.

26

***The legislative history of Crim. Proc. § 1-203.1 further demonstrates compliance with the warrant requirement***.

We find additional evidence of the statute's substantive compliance with the Fourth Amendment from the statute's legislative history. *Hammonds v. State*, 436 Md. 22, 44, 80 A.3d 698, 711 (2013) ("Even if the plain meaning is clear and unambiguous, we often look to the legislative intent and purpose to determine if they ratify our analysis and interpretation of a statute.").

The sponsors of Senate Bill 698 made clear, from the bill's introduction to its final passage, that the use of GPS tracking by law enforcement would satisfy the constitutional requirements articulated by the United States Supreme Court. In opening remarks to the Senate Committee on Judicial Proceedings, one of the bill sponsors, Senator Christopher Shank, explained that Senate Bill 698 adhered to the United States Supreme Court decision in *Jones*. *Hearing on S.B. 698 Before the S. Comm. on Jud. Proc.*, 2014 Leg., 434th Sess. at 1:32:15 (Statement of Senator Christopher B. Shank, S. Comm. on Jud. Proc.). The bill sponsors continued to cite *Jones* throughout the bill's legislative history and enactment. Fiscal and Policy Note, S.B. 698, 2014 Leg., 434th Sess. (Md. 2014); Floor Report, S.B. 698, 2014 Leg., 434th Sess. at 12-13 (Md. 2014) (adopting the unanimous holding from *Jones* in which "law enforcement must obtain a search warrant before using global positioning system (GPS) technology to track criminal suspects").

The bill sponsors in both the original version of the bill and during initial committee hearings used the term "warrant" to describe what law enforcement must obtain before

placing a GPS tracking device on a suspect's vehicle.[21]  As the Court of Special Appeals noted in its opinion, the bill sponsors struck the label "warrant" after the first reading of the bill and instead substituted the term "court order."

The Floor Report produced by the Senate Judicial Proceedings Committee explained that the replacement of "warrant" for an "order" was a "technical" amendment.[22] Floor Report, S.B. 698 at 7.  The Floor Report did not offer further elaboration other than reaffirming the bill's compliance with the constitutional requirements of GPS tracking set forth in *Jones*.  *Id.* at 12-13.  Even after revisions and amendments, including the technical

---

[21] We assume the bill sponsors originally used the term "warrant" because the United States Supreme Court used the same term in *Jones.*  The Bill File for SB 698 does not otherwise document why the bill sponsors originally selected "warrant" instead of "court order."

[22] The "technical" change in the Floor Report likely referred to an attempt by the bill sponsors to harmonize nomenclature with preexisting law enforcement practice and statutory naming conventions.  Before the enactment of Crim. Proc. § 1-203.1, some counties already required a showing of probable cause when law enforcement applied for a court order either to place a GPS tracking device or to gather cell-phone information. *See, e.g.*, Dario J. Broccolino, Letter to Chairman Brian E. Frosh of the Senate Judiciary Committee, S.B. 698, 2014. Leg., 434th Sess. (Md. 2014) ("Our office[, the State's Attorney for Howard County,] and the Howard County Police Department currently utilize a probable cause standard in obtaining court orders for both GPS tracking and real-time-cell phone tracking.").  Similarly, the Maryland Wiretap Act, codified within Title 10 of the Courts and Judicial Proceedings Article, already required law enforcement to seek a "court order" to obtain authority to intercept wireless communications.  Md. Code Ann., Cts. & Jud. Proc. § 10-406(a) ("The Attorney General, State Prosecutor, or any State's Attorney may apply to a judge of competent jurisdiction, and the judge, in accordance with the provisions of § 10-408 of this subtitle, may grant an order authorizing the interception of wire, oral, or electronic communications[.]").  Because Senate Bill 698 proposed authorizing law enforcement's monitoring of both GPS tracking data and real-time cellular location data in the same statutory provision, the term "court order" likely provided greater consistency with preexisting law enforcement practice and naming conventions in the Maryland Code.

28

change in nomenclature from "warrant" to "court order," the stated purpose of the bill still was to prohibit law enforcement from placing a GPS device without first obtaining a court order that substantively complied with the warrant requirement of the Fourth Amendment. Fiscal and Policy Note Revised, S.B. 698, 2014 Leg., 434th Sess. (Md. 2014) ("This bill authorizes a court to issue an order authorizing or directing a law enforcement officer to obtain 'location information' from an 'electronic device.' . . . A court may issue an order by application on a *determination that there is probable cause*[.] . . . An application for an order must be in writing, signed and sworn to by the applicant, and accompanied by an affidavit that sets forth the basis for the probable cause and contains facts within the personal knowledge of the affiant.") (emphasis added).

Conversely, there is absolutely nothing in the legislative record that questions the constitutionality of Crim. Proc. § 1-203.1 based on the term "court order."[23] The legislative history demonstrates the intent of the General Assembly to bring the use of GPS tracking by law enforcement into substantive compliance with the Fourth Amendment. Whittington cannot satisfy his burden of establishing the unconstitutionality of Crim. Proc. § 1-203.1.[24]

---

[23] The Bill File for S.B. 698 contains multiple letters of support and opposition to the proposed law. None of the letters, either from privacy advocates, such as the American Civil Liberties Union and the Electronic Frontier Foundation, or from law enforcement and State's attorneys, raised the issue of whether the label "court order" had any practical or legal bearing on the proposed law.

[24] Whittington's counsel conceded during oral argument before this Court that, apart from the label, the court order issued pursuant to Crim. Proc. § 1-203.1 otherwise satisfied the criteria of a valid warrant. Judge Raker asked, "[o]ther than nomenclature, what is missing here to satisfy the definitional requirements of a warrant?" Oral Argument at 5:25. Whittington's counsel replied, "I don't think I have argued in any of my papers that [court orders] don't have . . . the guts of a warrant." Oral Argument at 5:35.

We accordingly hold that the use of the term "court order" in Crim. Proc. § 1-203.1 satisfies the warrant requirement of the Fourth Amendment, and assume without deciding, that the court order satisfies Article 26 of the Maryland Declaration of Rights.

**B. There was a substantial basis to support the District Court's finding of probable cause.**

The Fourth Amendment and Article 26 of the Maryland Declaration of Rights require that no warrant, or in this case, court order, shall issue without probable cause. *See Birchead*, 317 Md. at 700, 566 A.2d at 493. We do not conduct a *de novo* inquiry into whether the court order in this case was supported by probable cause, rather we must determine whether the "*issuing judge had a substantial basis* for concluding that the [court order] was supported by probable cause." *Patterson*, 401 Md. at 89, 930 A.2d at 356 (emphasis added) (citing *Greenstreet v. State*, 392 Md. 652, 898 A.2d 961 (2006)). This Court uses a deferential standard of review when evaluating an issuing court's determination of probable cause. *Stevenson v. State*, 455 Md. 709, 723, 168 A.3d 967, 975 (2017); *Malcolm v. State*, 314 Md. 221, 229, 550 A.2d 670, 674 (1988) ("As the key protection from unreasonable government searches, warrants continue to be favored [by] law."). "[S]o long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Stevenson*, 455 Md. at 723-24, 168 A.3d at 975-76 (citation omitted); *see also Illinois v. Gates*, 462 U.S. 213, 236, 103 S. Ct. 2317, 2331 (1983) ("[W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review.").

30

The substantial basis test does not require "direct evidence that the evidence sought would be found in the place to be searched." *Stevenson*, 455 Md. at 724, 168 A.3d at 976. The substantial basis of an issuing court may be predicated on an affiant's professional experience and inferences drawn therefrom in deciding whether probable cause exists. *Moats v. State*, 455 Md. 682, 700-01, 168 A.3d 952, 962 (2017) (quoting *Ornelas v. United States*, 517 U.S. 690, 700, 116 S. Ct. 1657, 1663 (1996)). The substantial basis test also recognizes the inherent flexibility of the probable cause standard. "[P]robable cause may be inferred from the type of crime, the nature of the items sought, the opportunity for concealment, and reasonable inferences about where the defendant may hide the incriminating items." *Holmes v. State*, 368 Md. 506, 522, 796 A.2d 90, 100 (2002).

This Court has explained that suspected possession or distribution of narcotics frequently gives rise to a reasonable inference that evidence of such activity likely will be found in the defendant's home:

> The reasoning, supported by both experience and logic, is that, if a person is dealing drugs, he or she is likely to have a stash of the product, along with records and other evidence incidental to the business, that those items have to be kept somewhere, that if not found on the person of the defendant, they are likely to be found in a place that is readily accessible to the defendant but not accessible to others and *that the defendant's home is such a place.*

*Id.* at 521-22, 796 A.2d at 100 (emphasis added). Such reasonable inferences may satisfy the substantial basis test. *Id.* at 522, 796 A.2d at 100 (quoting *United States v. Thomas*, 989 F.2d 1252, 1255 (1993)) ("[O]bservations of illegal activity occurring away from the suspect's residence, can support a finding of probable cause to issue a search warrant for

31

the residence, if there is a *reasonable basis* to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence.") (emphasis added).

Even with the latitude afforded by deductive reasoning and circumstantial evidence, not all police inferences of narcotics activity within a home will overcome substantial basis review. "[M]ere observation, documentation, or suspicion of a defendant's participation in criminal activity will not necessarily suffice, by itself, to establish probable cause that inculpatory evidence will be found in the home." *Id.* at 523, 796 A.2d at 100. The neutral magistrate must be able to reasonably infer a logical connection, or "nexus" that ties police observations, contained within the four corners of the court order application,[25] to the defendant's home. *Id.* at 521, 796 A.2d at 99.

This Court upheld such a logical connection in *Holmes*. The police observed Holmes engage in a narcotics transaction less than a block from his home. *Id.* at 523, 796 A.2d at 96. The warrant application further documented Holmes' history of CDS violations, confederation with a "known drug violator," and the fact that police stopped Holmes at some distance away from his home and found "a large sum of money and a large quantity of marijuana[]" on his person. *Id.* at 518, 796 A.2d at 98. While there was no direct evidence linking the defendant's narcotics activity to his house, the circumstantial evidence provided a sufficient logical connection tying observable conduct to the defendant's home.

---

[25] We "ordinarily confine our consideration of probable cause solely to the information provided in the warrant and its accompanying application documents. We do not consider evidence that seeks to supplement or controvert the truth of the grounds advanced in the affidavit." *Patterson*, 401 Md. at 90, 930 A.2d at 357 (citation omitted).

Similarly, in *Mills v. State*, 278 Md. 262, 363 A.2d 491 (1976), the police arrested the defendant on a public street the day after the commission of a kidnapping, rape, and robbery. *Id.* at 276, 363 A.2d at 498-99. The victims informed police that the defendant had carried out these acts with a large hunting knife. *Id.*, 363 A.2d at 499. The police did not find a knife in the possession of the defendant but believed the knife would be in his home. *Id.* at 276, 363 A.2d at 499. The police obtained a warrant and found a large hunting knife in his home. *Id.* at 265, 363 A.2d at 493. On appeal, this Court concluded that there was a substantial basis to the finding of probable cause because it was reasonable to infer that the defendant would either leave or attempt to hide the large hunting knife within the defendant's house. *Id.* at 280, 363 A.2d at 501. "Although in a particular case it may not be easy to determine when an affidavit demonstrates . . . probable cause, *the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.*" *Id.*, 363 A.2d at 501 (emphasis added).

In the case at bar, the affidavit sworn by Detectives Underhill and Vivino provided a substantial basis for a finding of probable cause based on reasonable inferences, similar to those presented in *Holmes* and *Mills*, that logically connected observed activity to Whittington's residence. The detectives observed Whittington participate in suspected CDS transactions on July 5, October 7, and October 17, 2016 throughout Baltimore and Harford counties. While the detectives did not directly observe CDS activity at Cloverwood Court, the detectives reasonably inferred, similar to *Holmes* and *Mills*, that Whittington would store evidence related to the suspected criminal activity being conducted throughout the region at his residence. The GPS tracking device strengthened

33

the detectives' inference of CDS evidence being found in Whittington's home because it captured the movements of Whittington's vehicle traveling from Cloverwood Court to suspected narcotics transactions and back on October 12, 13, and 14.

Whittington's close association with Hall, a known narcotics dealer, parallels the defendant's "confederation with . . . [a] known drug violator" in *Holmes*. 368 Md. at 523, 796 A.2d at 101. The detectives learned about Hall and his suspected CDS operations from a confidential informant. The detectives then observed Hall engage in multiple suspected drug transactions throughout Harford County and in a manner similar to Whittington. The detectives also documented Hall's criminal history of CDS related charges. The detectives, through interception of cellular communications, also uncovered a close relationship between Whittington and Hall and coded language that the detectives believed described CDS activity.

The close relationship between Whittington and Hall extended beyond frequent cellular contact. The detectives observed Whittington and Hall engage in suspected CDS activity while operating in Whittington's 2002 Dodge Stratus. Whittington took unusual routes to and from Cloverwood Court and exhibited evasive driving patterns consistent with individuals engaged in CDS activity. The detectives also documented Whittington's past criminal history in which he was found in possession of over three ounces of cocaine. While there was no direct evidence of CDS activity at the house, the detectives could make the reasonable inference that Cloverwood Court was a "stash house" or at least contained some evidence of Whittington's CDS activity.

34

The professional experience and specialized CDS training of the detectives are also relevant to the substantial basis analysis. Detective Underhill has been a member of the Harford County Sheriff's Office since 2001 and assigned to the Task Force since 2007. He received specialized training in identifying and investigating CDS violations. He has made and assisted in numerous arrests relating to CDS activity. He has also authored or participated in the execution of "hundreds of Search and Seizure warrants[.]" He has witnessed over one thousand CDS transactions conducted by undercover officers and confidential informants, and hundreds of other CDS transactions during the course of criminal investigations. He has been accepted as an expert in the Circuit Court for Harford County and the United States District Court for the District of Maryland with regards to methods and practices of drug traffickers and drug conspiracies. Detective Vivino, currently assigned to the Task Force, has been a member of the Bel Air Police Department since 2012. He received specialized training in narcotics and narcotics investigation and "has written and participated in several search and seizure warrants for suspected CDS [activity.]"

The substantial basis becomes further evident when considering the entirety of the observations recited in the affidavit. *Greenstreet*, 392 Md. at 669, 898 A.2d at 971 ("This principle is known as the 'four corners rule.'"). While the detectives dedicated the balance of the sixteen-page affidavit to Whittington's vehicle and home, their interrelated, and at times overlapping, observations of Whittington's associates strengthen the substantial basis of the issuing court. For example, Hall also frequently drove to 2514 Hanson Road and 101 Orsburn Drive, in the same, brief manner as Whittington, which the detectives

suspected were operating as "stash houses" or sources of supply. Task Force detectives physically surveilled the 2514 Hanson Road address and observed what appeared to be an individual waiting to purchase cocaine from that location. Task Force detectives also observed that Hall and Whittington both travel "frequently" to the 101 Orsburn Drive address "in the midst of conducting other behavior that is consistent with CDS activity." Looking to the entirety of the affidavit strengthens the reasonable inferences of criminal wrongdoing in Whittington's vehicle and home.

Admittedly, the detectives did not observe direct evidence of CDS activity, but the absence of direct evidence does not preclude a finding of probable cause by the issuing court on a deferential, substantial basis review. Any lingering doubts about the reasonableness of the inference of CDS activity believed to be found in Whittington's home are resolved in favor of "the preference to be accorded to warrants." *Mills*, 278 Md. at 280, 363 A.2d at 501. We conclude that the combination of GPS tracking, personal observation of Whittington and associates engaged in CDS activity, and experience of the detectives in investigating CDS crimes provided a substantial basis for the issuing court to find that evidence of CDS activity was likely to be found in Whittington's home.

## C. The good faith exception applies *arguendo*.

In light of our holding that the issuing judge had a substantial basis for concluding there was probable cause, we do not need to resolve whether the good faith exception to the exclusionary rule applies to this case. "We are nonetheless constrained to address it, as an alternative holding, in an effort to stem the tide of what we perceive to be a recent and promiscuous overuse of *Leon*'s rare exemptions from the good faith exception in a way

36

that *Leon* never intended."[26]  *State v. Jenkins*, 178 Md. App. 156, 194, 941 A.2d 517, 539 (2008).  Assuming *arguendo* that the warrant application contained an inadequate showing of probable cause, the good faith exception to the exclusionary rule of the Fourth Amendment still applied.

The good faith exception prevents the exclusion of evidence obtained pursuant to a warrant later shown to lack probable cause when law enforcement, in objective exercise of their professional judgment, reasonably relied on a warrant issued by a detached and neutral magistrate.  *Leon*, 468 U.S. at 920-21, 104 S. Ct. at 3419 (noting that the deterrent effect of the exclusionary rule cannot be served when an officer in good faith relies on the magistrate's error).  On this basis, "suppression of evidence obtained pursuant to a warrant should be ordered on a case-by-case basis and only *in those unusual cases in which exclusion will further the purposes of the exclusionary rule*."  *Id.* at 918, 104 S. Ct. at 3418 (emphasis added) (footnote omitted).

The *Leon* Court articulated four scenarios where an officer's reliance might be so unreasonable as to warrant suppression of evidence.[27]  Whittington draws our attention to scenario number three—that the warrant application was so lacking in probable cause that

---

[26] The United States Supreme Court in *Leon* acknowledged "that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued" but in most cases "a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Leon*, 468 U.S. at 922, 104 S. Ct. at 3420 (internal citations, quotations, and footnote omitted).

[27] *See supra* note 15.

the detectives could not have reasonably relied upon it. We have previously described an affidavit so lacking in probable cause to be "bare bones" consisting of "wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *Patterson*, 401 Md. at 107, 930 A.2d at 367.[28]

In *Patterson*, this Court held that "[a]lthough we have determined that there was no substantial basis to support a probable cause finding, we cannot say that Officer Haak was unreasonable in relying on the warrant." *Id.* at 108, 930 A.2d at 367-68. Officer Haak pursued Patterson after an attempt to flee a traffic stop. *Id.* at 82, 930 A.2d at 352. After Officer Haak subdued Patterson, the officer found an empty gun holster lying on the ground. *Id.* at 83, 930 A.2d at 352. Officers also found a nearby silver magazine containing live rounds commensurate with the size of the empty holster. *Id.*, 930 A.2d at 352-53. A witness also noticed Patterson clutching his right hip "as if he was concealing something" while initially fleeing the traffic stop. *Id.* at 83, 930 A.2d at 352. Officer Haak applied for and received a warrant to search a motel room, which Officer Haak believed Patterson was using as a temporary residence and would contain an illegal firearm, among other contraband. *Id.* at 87, 930 A.2d at 355. The search team found drugs and drug

---

[28] A review of case law that gave rise to *Leon*'s third exception to the good faith exception demonstrates how "bare bones" a warrant deficient in probable cause can be. In *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509 (1964), the warrant application merely provided, "[a]ffiants have received reliable information from a credible person and do believe that [narcotics] are being kept at the above described premises[.]" *Id.* at 109, 84 S. Ct. at 1512. Similarly in *Nathanson v. United States*, 290 U.S. 41, 54 S. Ct. 11 (1933) the warrant application merely provided, "[affiant] has stated under his oath that he has cause to suspect and does believe that certain [illegal] merchandise . . . is now deposited and contained within the premises of J.J. Nathanson[.]" *Id.* at 44, 54 S. Ct. at 12.

paraphernalia. *Id.*, 930 A.2d at 355. The circuit court denied Patterson's motion to suppress, and the Court of Special Appeals affirmed by concluding that there was a substantial basis to support a finding of probable cause. *Id.* at 89-90, 930 A.2d at 356.

This Court in *Patterson* disagreed with the finding of probable cause that a gun would be found at Patterson's residence. *Id.* at 104, 930 A.2d at 365. This Court noted that while there was evidence of a gun at the time of the traffic stop, the affidavit did not cite any particular facts that could infer possession of a gun in the motel room. *Id.* at 103, 930 A.2d at 365. "[T]he mere observation, documentation, or suspicion of a defendant's participation in criminal activity will not necessarily suffice, by itself, to establish probable cause that inculpatory evidence will be found in the home. . . . There must be something more that, directly *or by reasonable inference*, will allow a neutral magistrate to determine that the contraband may be found in the home." *Id.* at 103, 930 A.2d at 365 (quoting *Holmes*, 368 Md. at 523, 796 A.2d at 100-01) (emphasis added).

While the Court held that the warrant in *Patterson* lacked a substantial basis, this Court identified other indicia of Officer Haak's reasonable reliance on the warrant. *Id.* at 107-08, 930 A.2d at 367. Officer Haak found a discarded holster and other officers found a magazine containing bullets near Patterson's attempted flight path. *Id.* at 108, 930 A.2d at 368. An eyewitness observed Patterson holding his hip while attempting to flee. *Id.*, 930 A.2d at 368. The warrant listed Patterson's prior criminal history. *Id.*, 930 A.2d at 368. The warrant was supported "by an affidavit based in part on the first-hand knowledge and the observations of police officers[.]" *Id.* at 108-09, 930 A.2d at 368. These indicia could have led a reasonable officer to conclude that there was probable cause to believe

Patterson may have an illegal weapon stored at his residence. *Id.* at 109, 930 A.2d at 368. Finally, this Court noted that "the application for the search warrant provided sufficient evidence to create disagreement among thoughtful and competent judges as to the existence of probable cause." *Id.* at 109, 930 A.2d at 368 (footnote omitted).

Similar to Officer Haak's reasonable reliance on the warrant in *Patterson*, the detectives in this case reasonably relied on the search warrant issued by the District Court, because it contained sufficient particularized facts for an officer to objectively and in good faith rely on the finding of probable cause by a detached, neutral magistrate. Like in *Patterson*, the detectives in this case provided a detailed affidavit based on first-hand knowledge and observation of Whittington's movements. The affidavit listed Whittington's past criminal history that included a drug possession charge. Finally, and similar to *Patterson*, the search warrant generated disagreement among thoughtful and competent judges as to the existence of probable cause. The District Court believed there was adequate probable cause, the circuit court disagreed, and we disagreed with the circuit court. "To that end, we cannot say as a matter of law that [the officer] should have second guessed the issuing-judge's determination that probable cause existed." *Id.* at 109, 930 A.2d at 368 (footnote omitted).

Whittington cites *Agurs* to argue that there was such a lack of probable cause that the detectives must have unreasonably relied on the warrant. Whittington's reliance on *Agurs* is unavailing. As a matter of law, Whittington conflates the two separate legal standards for evaluating probable cause and the good faith exception. "The application of the good faith exception does not hinge upon the affidavit providing a substantial basis for

40

determining the existence of probable cause." *Patterson*, 401 Md. at 105, 930 A.2d at 365.

"[S]ubstantial basis" is already a deferential standard in reviewing probable cause—a fluid

and forgiving concept in its own right[29]—and the good faith exception "is a less demanding

showing than the 'substantial basis' threshold required to prove the existence of probable

cause in the first place." *Id.*, 930 A.2d at 366 (quoting *United States v. Bynum*, 293 F.3d

192, 195 (4th Cir. 2002)).  A majority of judges in *Agurs* acknowledged this point of law:

"We do not suggest that the good faith exception can never apply when a reviewing court

determines that an affidavit failed to satisfy the nexus requirement.  There will undoubtedly

be circumstances where 'reasonable minds may differ' as to whether the nexus requirement

was satisfied." *Agurs*, 415 Md. at 87 n.12, 998 A.2d at 882 n.12.[30]

Contrary to Whittington's assertion, the facts of *Agurs* support the detectives'

reasonable reliance on the warrant in this case.  In *Agurs*, the police relied upon their

previous experience with drug investigations and a single instance of a suspected drug

transaction in and around a clothing store to establish probable cause of drug activity

---

[29] The Court of Special Appeals recently observed in *Freeman v. State*, 249 Md. App. 269, 245 A.3d 164 (2021), that "probable cause means something less than 'more likely than not.'" *Id.* at 301, 245 A.3d at 182; *see also State v. Johnson*, 458 Md. 519, 535, 183 A.3d 119, 129 (2018) (noting "probable cause is not a high bar").

[30] Judge Clayton Greene, Jr., who wrote the majority opinion in *Patterson*, also authored the plurality opinion in *Agurs*.  Judges Joseph F. Murphy and Sally D. Adkins concurred in Part A of the plurality opinion in *Agurs*, forming "[t]he authoritative majority opinion of the Court" in which the above quoted footnote twelve is found. *State v. Johnson*, 208 Md. App, 573, 600, 56 A.3d 830, 846 (2012).  Judge Mary Ellen Barbera (now Chief Judge Barbera), joined by Judge Adkins, dissented and would have applied the good faith exception to the exclusionary rule. *Agurs*, 415 Md. at 113, 998 A.2d at 898 (Barbera, J., dissenting).  Therefore, both the plurality opinion and the dissent recognized the distinction between substantial basis and the good faith exception.

41

occurring within Agurs's home. *Id.* at 88-89, 998 A.2d at 883-84. Conversely, the detectives in the instant case provided far more indicia of criminal activity to support a reasonable inference that Cloverwood Court contained evidence of CDS activity. Unlike *Agurs*, the police documented Whittington returning to Cloverwood Court at least four times over the course of the investigation. The detectives, through the lens of GPS tracking, personal observation, and twenty years of cumulative experience, perceived Whittington to be engaging in CDS activity at various locations throughout Harford County and nearby counties, only to return to Cloverwood Court each day. The affidavit provided specific facts that supported the detectives' reasonable, good faith reliance on the search warrant.

## CONCLUSION

For the reasons previously explained, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**